**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

UNITED STATES OF AMERICA,

     *Plaintiff*,

v.

SUIRUI GROUP CO., LTD., *et al.*,

     *Defendants*.

</td>
<td>

Civil Action No. 26-00369 (AHA)

</td></tr>
</table>

**Memorandum Opinion**

Congress has authorized the President to block a foreign person from buying an American company upon finding the transaction "threatens to impair the national security of the United States." 50 U.S.C. § 4565(d)(1). If the transaction has already happened, the President can order the foreign purchaser to divest its interests in the American company. *Id.* The executive branch regularly reviews these transactions, and Presidents have, infrequently, ordered divestment because a transaction poses national security risks that cannot otherwise be mitigated. ECF No. 35-2 ¶ 11; ECF No. 44 at 9.

Here, the President found that Suirui Group, a Chinese company, and its subsidiary, through their purchase of Jupiter Systems—an American company that makes processors and displays used by U.S. government defense and military institutions, and by other domestic entities that operate critical infrastructure—"might take action that threatens to impair the national security of the United States." *Regarding the Acquisition of Jupiter Systems, LLC by Suirui International Co., Limited*, 90 Fed. Reg. 31125, 31125 (July 11, 2025). The President ordered Suirui Group and its subsidiary to divest all interests and rights in Jupiter Systems by November 5, 2025. *Id.* at

31125–26. The companies did not comply with the President's order by divesting from Jupiter Systems, despite asking for and getting multiple extensions. *See* ECF No. 35-2 ¶¶ 24, 28. The government filed this suit against Suirui Group, its subsidiary, and Jupiter Systems to enforce the President's order and now moves for a preliminary injunction, asking the court to appoint a receiver to manage Jupiter Systems, to mitigate the national security risk the President identified pending litigation of an order requiring full divestment. *See* ECF No. 6; 50 U.S.C. § 4565(d)(3). Given Suirui's past and continued noncompliance with the President's order and failure to make meaningful efforts to divest, the continuing national security risks posed by Suirui's control of Jupiter Systems, and the strong public interest in addressing those risks, the court finds the government has satisfied its burden for a preliminary injunction and that appointing a receiver is the appropriate relief.

## I.    Background

### A.  The CFIUS Review Process And Presidential Prohibition Of Foreign Purchases Of American Companies

Section 721 of the Defense Production Act of 1950, codified as amended at 50 U.S.C. § 4565, authorizes the President, acting through the Committee on Foreign Investment in the United States ("CFIUS"), to review and investigate certain "covered transactions," including "[a]ny merger, acquisition, or takeover . . . by or with any foreign person that could result in foreign control of any United States business." 50 U.S.C. § 4565(a)(4)(A)(i), (B)(i). The Act also authorizes the President to "take such action for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States." *Id.* § 4565(d)(1).

CFIUS, an interagency committee chaired by the Secretary of the Treasury and made up of members from several other agencies, initiates the review of a covered transaction in one of two

ways. *See id.* § 4565(k)(1)–(3). First, a party to the transaction can voluntarily give written notice of the transaction to CFIUS; second, CFIUS can unilaterally initiate review of a covered transaction it learns of. *Id.* § 4565(b)(1)(C)–(D). During its review of a transaction, CFIUS is tasked with determining "the effects of the transaction on the national security of the United States." *Id.* § 4565(b)(1)(A)(i). To make its determination, CFIUS considers various factors, such as "the potential national security-related effects on United States critical infrastructure" and "the control of domestic industries and commercial activity by foreign citizens as it affects the capability and capacity of the United States to meet the requirements of national security." *Id.* § 4565(b)(1)(A)(ii), (f). If, upon review of the transaction, CFIUS determines the transaction "threatens to impair the national security of the United States and the risk has not been mitigated during or prior to the review," it must then "immediately conduct an investigation of the effects of [the] covered transaction on the national security of the United States, and take any necessary actions in connection with the transaction to protect the national security of the United States." *Id.* § 4565(b)(2)(A), (B)(i)(I). This may, and often does, include negotiating voluntary mitigation measures to reduce the risk posed. *Id.* § 4565(l)(3); *see also* ECF No. 44 at 10. CFIUS may, "at any time during the review or investigation of a covered transaction . . . refer the transaction to the President for action." 50 U.S.C. § 4565(l)(2).

Before referring any transaction to the President for divestment, CFIUS must conduct "a risk-based analysis" of the transaction's "effects on the national security of the United States," including an "assessment of the threat, vulnerabilities, and consequences to national security related to the transaction." *Id.* § 4565(l)(4)(A). The risk-based analysis sets forth the information CFIUS relies on in making its determination to refer a transaction to the President, and it generally includes both classified and unclassified information. *Id.*; ECF No. 35-1 ¶ 13. When CFIUS is

considering referral to the President to prohibit a transaction, it sends the parties to the transaction a separate letter that notifies them of CFIUS's national security concerns and plans for referral, provides the unclassified information that CFIUS relied on, and invites the parties to provide additional information for CFIUS's consideration. ECF No. 35-1 ¶ 15; ECF No. 44 at 32–33.

After the President receives a referral from CFIUS, he may "take such action for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States." 50 U.S.C. § 4565(d)(1). The President may exercise this authority if he finds both "credible evidence that leads the President to believe that a foreign person that would acquire an interest in a United States business or its assets as a result of the covered transaction might take action that threatens to impair the national security" and that "provisions of law, other than this section and the International Emergency Economic Powers Act, do not, in the judgment of the President, provide adequate and appropriate authority for the President to protect the national security." *Id.* § 4565(d)(4).

The President, acting through CFIUS, reviews a large volume of transactions each year. ECF No. 35-2 ¶ 11. Typically, if national security risks are identified, CFIUS works with the parties to negotiate a voluntary mitigation agreement or a voluntary divestment. ECF No. 44 at 10–11. Because most national security risks are resolved voluntarily, Presidents have exercised their authority to order divestment only seven times. *Id.* at 9, 69. This case marks the first time the government has filed a lawsuit to enforce such an order. *Id.* at 28–29.

**B. The CFIUS Review And Presidential Order Relating To Suirui's Purchase Of Jupiter Systems[1]**

Suirui Group is a privately owned Chinese company subject to laws requiring information and intelligence sharing with the Chinese government, and its voting shareholders include a Chinese state-owned enterprise that the U.S. Department of Defense classifies as a Chinese military company operating in the United States. ECF No. 35-2 ¶ 18; ECF No. 38-10 at 1–4; ECF No. 44 at 12–13. In February 2020, Suirui Group, acting through its subsidiary Suirui International (referred to together as "Suirui" throughout this opinion), bought Jupiter Systems, a U.S. company that makes display wall processors, displays, and related software that it sells to commercial and U.S. government customers, including all branches of the military, components or customers of the U.S. Department of Energy and the Department of Defense, state and local governments, and private transportation and telecommunications companies. ECF No. 31-2 ¶ 4; ECF No. 35-2 ¶¶ 14, 16; ECF No. 35-4 at 1. Jupiter Systems provides remote and in-person support, as well as software and firmware updates, for its products, including those used by government customers. ECF No. 31-2 ¶ 11; ECF No. 35-2 ¶ 16; ECF No. 44 at 15–16.

When Suirui bought Jupiter Systems, it did not send voluntary notice of the transaction to CFIUS. *See* ECF No. 35-2 ¶ 14; ECF No. 31-3 ¶¶ 6–7. Since then, Suirui has exercised control over Jupiter Systems, including by appointing Suirui employees to serve on Jupiter Systems' board and by appointing a Suirui employee, Jay Xia, as CEO of Jupiter Systems. ECF No. 38-10 at 3–4; ECF No. 35-2 ¶ 17; ECF No. 31-3 ¶ 1; ECF No. 44 at 14–15. Jupiter Systems has also increased the number of parts sourced from China and the number of employees located in China. ECF No. 44 at 17–18.

---

[1]    The facts described reflect the court's findings based on the testimony and evidence presented at the court's evidentiary hearing and with accompanying briefing.

In March 2024, CFIUS initiated an inquiry into the transaction and, about a month later, asked the defendants to file a notice regarding the transaction. ECF No. 38-10 at 16–17. After the defendants twice submitted incomplete notices, CFIUS had regular conversations with the defendants and requested various additional information to allow CFIUS to conduct due diligence regarding the relationship between the Chinese government and Suirui and potential national security risks arising from the transaction. ECF No. 38-10 at 16–27; ECF No. 44 at 18–19. Over the course of CFIUS's review and investigation of the transaction, the defendants' responses to requests for information were often untimely, incomplete, contained conflicting information, or were not submitted at all. ECF No. 38-10 at 16–27; ECF No. 44 at 19. By the end of the review and investigation period, CFIUS identified national security risks arising from the potential compromise of products integrated into military and critical infrastructure systems, which could enable unauthorized access to data or disablement of those systems. ECF No. 35-5 at 2. On a December 2024 phone call and in a January 2025 letter, CFIUS told Suirui and Jupiter Systems that it had identified national security risks. *Id.* at 1; ECF No. 44 at 20–21.

The defendants then withdrew from engagement with CFIUS, and CFIUS initiated further review and concluded no mitigation short of divestment would address the national security risks posed by the transaction. ECF No. 35-2 ¶ 20; ECF No. 44 at 20–21; ECF No. 38-10 at 14, 16. CFIUS prepared a risk-based analysis of the transaction for referral to the President and, on April 30, 2025, sent the defendants a letter describing CFIUS's national security concerns and the unclassified evidence on which it relied. ECF No. 44 at 32–34; *see* ECF No. 38-10. The letter also informed the defendants that CFIUS anticipated referring the matter to the President with a recommendation to prohibit the transaction if the defendants did not negotiate a plan for voluntary divestment that would address the national security concerns. ECF No. 38-10 at 14. The letter

invited the defendants to provide additional relevant information and discuss the matter further with CFIUS. *Id.* at 14–15. In the months that followed, Suirui rejected any possibility of voluntary divestment and instead proposed less restrictive mitigation measures that CFIUS had already found insufficient. ECF No. 35-4 at 1–5; ECF No. 44 at 11–12.

On July 7, 2025, CFIUS sent another letter to the defendants, supplementing the April letter with additional information, including a summary of CFIUS's engagement with the defendants since April. *See* ECF No. 35-4. The July letter also informed the defendants that "CFIUS is referring the matter to the President for decision." *Id.* at 5.

The next day, the President issued an order saying there is credible evidence that Suirui, through its acquisition of Jupiter Systems, "might take action that threatens to impair the national security of the United States." 90 Fed. Reg. at 31125. The order further said the transaction "is hereby prohibited" and that Suirui's ownership of any interest in Jupiter Systems or its assets "is also prohibited." *Id.* The President ordered Suirui to divest all interests and rights in Jupiter Systems within 120 days unless extended by CFIUS. *Id.* at 31125–26.

After the President's order, the Departments of Defense and the Treasury closely engaged with the defendants to oversee the implementation of interim security measures and divestment efforts. ECF No. 44 at 21–25; ECF No. 35-2 ¶ 23. The security measures included protocols to limit access to Jupiter Systems' properties and systems. ECF No. 44 at 24–25. The measures were intended to be temporary and were not capable of addressing the national security threat in the long term. *Id.* at 24–25, 80. The agencies also had legitimate concerns that Jupiter Systems, as a small company, would not be able to properly implement the controls. *Id.* at 80; ECF No. 35-2 ¶ 26.

In the months that followed, Suirui twice asked for extensions of the divestment deadline. ECF No. 44 at 28–31. In each instance, CFIUS granted an extension—in one instance allowing an extension that was more abbreviated than what was sought and in the other instance conditioning any further extensions on production of a term sheet by the deadline. *Id.* Throughout this period, Suirui multiple times committed to providing term sheets for sales of Jupiter Systems, but missed the deadlines, only to later provide no term sheet or provide a term sheet that did not comply with the President's order. *Id.* at 22–23, 30–32. In addition, when U.S.-based employees of Jupiter Systems sought out a buyer to comply with the President's divestment order, Suirui resisted the efforts and indicated the Chinese government would not allow the company to be sold to a North American buyer. *Id.* at 106–07, 114–15, 132, 136–37. At the court's evidentiary hearing, Suirui employee and Jupiter Systems CEO Jay Xia testified that Suirui's efforts to divest its interests in Jupiter Systems following the President's order had proceeded slowly, in part because Suirui was communicating with and seeking the approval of the Chinese government for any sale. *Id.* at 132–36, 139–40, 145–46.

After Suirui failed to meet the second extended deadline, the government sued to enforce the President's order. ECF No. 1; *see* 50 U.S.C. § 4565(d)(3). The government has moved for a preliminary injunction, asking the court to appoint a receiver to manage Jupiter Systems' operations pending litigation of its request for an order requiring complete divestment under the President's order. ECF No. 6. After receiving briefing from the parties, the court held an evidentiary hearing, at which it heard testimony from a Treasury Department official concerning the national security review and risks posed by the transaction, an employee of Jupiter Systems who discussed Jupiter Systems' efforts to respond to CFIUS's inquiries and comply with interim security measures, as well as Suirui employee and Jupiter Systems CEO Jay Xia who discussed

the defendants' engagement with CFIUS and Suirui's divestment efforts following the President's order. *See* ECF No. 44. The court also gave the parties an opportunity to submit post-hearing briefing on the relevant issues, including application of the preliminary injunction factors, appropriate relief, and consolidation with the merits. *See* ECF Nos. 41, 43.

## II.    Discussion

To prevail on its motion for preliminary injunction, the government must show it is likely to succeed on the merits, it will likely suffer irreparable harm without preliminary relief, the balance of equities tips in its favor, and the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The court accordingly considers these factors, mindful that "[a] preliminary injunction is an extraordinary remedy" and "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 22, 24. Because the court concludes the government has satisfied this stringent burden, it also carefully considers the appropriate scope of preliminary relief and next steps.

### A.  The Government Is Likely To Succeed On The Merits

The government has made a strong showing it will likely succeed on its claim to enforce the President's order requiring Suirui to divest its interests in Jupiter Systems.

Congress authorized the President to order a foreign purchaser to divest its interests in an American company upon finding "there is credible evidence that leads the President to believe that a foreign person that would acquire an interest in a United States business or its assets as a result of the covered transaction might take action that threatens to impair the national security" and "provisions of law, other than this section and the International Emergency Economic Powers Act, do not, in the judgment of the President, provide adequate and appropriate authority for the President to protect the national security in the matter before the President." 50 U.S.C. § 4565(d)(4). There is no dispute that, here, the President made those findings when he ordered

Suirui to divest its interests in Jupiter Systems. *See* 90 Fed. Reg. at 31125. There is no dispute that the President's findings and action to prohibit the transaction are not themselves subject to judicial review. *See* 50 U.S.C. § 4565(e)(1). And there is no dispute the government can, upon noncompliance, sue to enforce the order. *See id.* § 4565(d)(3).

It is also undisputed that Suirui has not complied with the President's order: it has not divested from Jupiter Systems. *See* ECF No. 35-2 ¶ 24; ECF No. 31-3 ¶¶ 18, 21. Indeed, based on the live testimony at the court's evidentiary hearing and other evidence proffered by the parties at this stage, the court finds that despite the President's order, Suirui has not made meaningful efforts to divest its interests in Jupiter Systems. *See* ECF No. 44 at 21–24, 29–32, 105; ECF No. 35-2 ¶¶ 24–25, 28–29. To the contrary, the record shows that Suirui repeatedly delayed compliance with the President's order, seeking extensions, only to then blow the extended deadlines and not deliver plausible terms for a sale. ECF No. 44 at 23–24, 29–32; ECF No. 35-2 ¶ 28. The court also finds based on the current record that Suirui took affirmative actions to impede its compliance with the order. This includes contacting the Chinese government to complain about the President's divestment order and limiting the universe of potential buyers to those the Chinese government would approve. ECF No. 44 at 132–34, 139–40, 145–46. And it includes impeding U.S.-based employees of Jupiter Systems when they sought out potential buyers, initially resisting their efforts to hire a broker and then refusing their efforts to pursue the sale of Jupiter Systems to a North American company. *Id.* at 106–08, 114–15, 132, 136–37. The government is accordingly likely to succeed on its claim to enforce the President's order, resulting in a court order of divestment. *See* 50 U.S.C. § 4565(d)(3) (authorizing a court to enforce a presidential order by providing "appropriate relief, including divestment relief").

The defendants argue the government is unlikely to succeed in enforcing the President's divestment order because the order violated procedural due process. ECF No. 31 at 22–30. In particular, they say CFIUS did not adequately disclose the unclassified record it relied on to refer the transaction to the President and therefore deprived the defendants of "the right to know the factual basis for the action and the opportunity to rebut the evidence supporting that action." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014). Based on the record before the court at this stage, the court disagrees.

In *Ralls*, the D.C. Circuit recognized that when the President issues an order requiring a foreign purchaser to divest its interests in an American company, an affected party has the right to "be informed of the official action, be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence." *Id*. at 319. There, Ralls, a company owned by two Chinese nationals, challenged the President's order requiring it to divest its interests in American windfarm companies. *Id.* at 304–06. During the review process, CFIUS asked Ralls to respond to questions and Ralls gave a presentation to CFIUS, but "CFIUS did not apprise Ralls of the gravamen of its concern with the transaction and did not, during the presentation or at any other time, disclose to Ralls the information it reviewed." *Id.* at 305. The D.C. Circuit held that Ralls had a property interest protected by due process and that the Defense Production Act's bar on judicial review of the President's actions and findings did not preclude judicial review of a due process challenge. *Id*. at 311, 316–17. Recognizing that "due process is flexible and calls for such procedural protections as the particular situation demands," the court held that "a substantial interest in national security" allows the government to withhold classified information relied upon, but affected parties are entitled to "notice of, and access to, the unclassified information used to prohibit the transaction." *Id.* at 317, 320. The circuit explained

11

that, although Ralls had the opportunity to present evidence to CFIUS, it "never had the opportunity to tailor its submission to the [government's] concerns or rebut the factual premises underlying the President's action." *Id.* at 320.

The parties here do not dispute that the President's divestment order implicates a property interest protected by due process, and they do not dispute that CFIUS had no obligation to share classified information it relied on in referring the transaction to the President with a recommendation to prohibit the transaction. *See* ECF No. 31 at 25; ECF No. 35 at 11; ECF No. 44 at 167. The court concludes the government is likely to succeed in also showing that CFIUS provided the requisite process, including notice of its concerns and its plan to refer the transaction to the President, the unclassified evidence it relied on, and the opportunity to rebut the evidence. *See Ralls*, 758 F.3d at 319. CFIUS's April 30, 2025, letter told the defendants it planned to refer the transaction to the President with a recommendation to prohibit the transaction if they were unable to negotiate a voluntary divestment. ECF No. 38-10 at 14. The letter explained that CFIUS had concerns about "the potential compromise of Jupiter Systems' technology that is integrated into military and critical infrastructure systems, which could enable unauthorized access to data or disablement of critical systems." *Id.* at 2. The July 7, 2025, letter reiterated those concerns. ECF No. 35-4 at 1.

The letters also told the defendants the information CFIUS relied on to refer the transaction to the President. After *Ralls*, Congress amended § 4565 to provide that CFIUS's referral of a transaction to the President for action "shall be based on a risk-based analysis, conducted by the Committee, of the effects on the national security of the United States of the covered transaction." 50 U.S.C. § 4565(l)(4)(A); *see* Foreign Investment Risk Review Modernization Act of 2018, Pub. L. No. 115-232, § 1718, 132 Stat. 1636, 2194–95 (2018). At the court's evidentiary hearing, Sarah

12

Oldham, deputy director in the Office of Compliance and Enforcement under the Office of Investment Security at the U.S. Department of the Treasury, testified to how this process plays out, generally and in this particular case. First, when CFIUS plans to refer a matter to the President for action, it prepares the statutorily required risk-based analysis, a classified document. ECF No. 44 at 32–33. The agency then pulls out all of the unclassified information from the risk-based analysis, putting it into a letter that can be shared with the parties. *Id.* at 33; *see also* ECF No. 35-1 ¶ 15 (explaining that "CFIUS's policy and practice for drafting a [letter for the parties] involves putting all unclassified information and sources relevant to the risk and the Committee's determination from the [risk-based analysis] and [national security threat assessment] into a new document, in addition to providing contextual information regarding the Committee's process and approach to risk-based analysis"). Oldham further testified that CFIUS followed that process in this case: CFIUS began by "pulling out all of the unclassified information" and "controlled information" from the risk-based analysis and putting it into the April 30 letter to the defendants. ECF No. 44 at 33–34; *see also* ECF No. 35-1 ¶ 21 (affirming that "CFIUS followed its policy and practice here"). Oldham further testified that, in preparation for her testimony, the Department of the Treasury did "a side-by-side comparison of the risk-based analysis prepared for this transaction and the April 30 due process letter sent to Defendants" and "found that all unclassified information had been put into the April 30th due process letter with one exception." ECF No. 44 at 33; *see also* ECF No. 35-1 ¶¶ 20–21 (confirming the letter sent to defendants included "the unclassified information upon which the Committee relied in deciding to refer the matter to the President" with "one minor exception"); ECF No. 41-1 ¶ 16 (Thomas Argall, deputy director for global investment in the Office of Global Investment and Economic Security under the Office of the Assistant Secretary of Defense for Industrial Base Policy, attesting that "[e]xcept for" information

13

"referencing active law enforcement investigations, the substance of all [controlled unclassified information] in the [risk-based analysis] regarding the national security risk was included in the Letters").[2]

CFIUS also provided the defendants with an opportunity to rebut its concerns and the unclassified evidence it relied on. In the April 30 letter to the defendants, CFIUS invited the defendants to "provide CFIUS with additional relevant information for its consideration" and engage in further conversations with CFIUS. ECF No. 38-10 at 14–15. And thereafter, the defendants engaged in further back and forth regarding the April letter. ECF No. 44 at 81. Indeed, before referring the matter to the President for action, CFIUS issued a second letter on July 7, summarizing the additional correspondence between CFIUS and the defendants. ECF No. 44 at 81; *see* ECF No. 35-4.

The government is likely to succeed in showing CFIUS gave the defendants notice of its concerns, access to the unclassified evidence it relied on, and an opportunity to rebut the concerns and evidence. The defendants therefore had "the opportunity to tailor [their] submission to [CFIUS's] concerns" and "rebut the factual premises underlying the President's action." *Ralls*, 758 F.3d at 320. That is what due process requires.

---

[2]   According to Oldham's testimony, which the court finds credible, CFIUS's April 30 letter inadvertently omitted one of four examples of misrepresentations the defendants had made in response to a question from CFIUS, which had been included in the risk-based analysis and should have been included in the April 30 letter. ECF No. 44 at 33–34; *see also* ECF No. 35-1 ¶ 21; ECF No. 35 at 10 n.3. The defendants do not argue the omission was material. *See* ECF No. 44 at 194; ECF No. 43 at 11 n.6. The court finds this inadvertent omission was not material or prejudicial given that it was included as one of a series of misrepresentations and was premised on the defendants' own responses to a question set. *See Epsilon Elecs., Inc. v. U.S. Dep't of Treasury, Off. of Foreign Assets Control*, 857 F.3d 913, 931 (D.C. Cir. 2017) (rejecting due process challenge related to agency not disclosing two pieces of evidence underlying its decision because the challenger did not carry "its burden to demonstrate that it was prejudiced by this alleged error").

The defendants do not contest that CFIUS gave them notice of its concerns and plan to refer the transaction to the President but say CFIUS did not adequately disclose the unclassified evidence it relied on or provide adequate opportunity to rebut its evidence. Neither argument is persuasive. First, the defendants speculate that CFIUS relied on unclassified information that was not included in the April 30 letter. *See* ECF No. 31 at 26–27, 29–30; ECF No. 43 at 10–11. The defendants characterize the April 30 letter they received as just a "summary" of the unclassified information that CFIUS relied on and posit that CFIUS relied on underlying material that the defendants "would have wanted to examine during the CFIUS process." ECF No. 31 at 26, 29; *see also* ECF No. 44 at 39–41 (defendants' counsel cross-examining government witness about the possibility CFIUS staff considered unclassified source materials in preparing the April 30 letter). The defendants note, for example, that the April letter refers to "assessments of Department of Defense ('DOD'), Department of Energy ('DOE'), and Department of Homeland Security ('DHS') subject matter experts" and surmise there must be additional information that could have been turned over. ECF No. 31 at 29; *see* ECF No. 38-10 at 2. But, at least on the current record, the court finds no basis to credit that speculation and, to the contrary, credits the government's testimony that CFIUS relied on only the risk-based analysis it conducted, as required by statute, and provided all unclassified and uncontrolled information that was in the risk-based analysis to the defendants. *See* ECF No. 44 at 33, 40–41; ECF No. 41-1 ¶¶ 11–16; ECF No. 35-1 ¶¶ 13, 20–21; *see also* 50 U.S.C. § 4565(l)(4)(A) ("Any determination of the Committee . . . to refer a covered transaction to the President . . . shall be based on a risk-based analysis."). Indeed, in response to the defendants' argument, a Defense Department official attested that the only controlled unclassified information relating to the subject matter expert assessments that was not disclosed was the "identities of [DoD], DHS, and DOE subject matter experts whose analysis is

15

included in the [risk-based analysis], and which are generally cited as U.S. Government subject matter experts throughout the April 30 Letter." ECF No. 41-1 ¶ 14.[3]

The defendants, second, argue they did not have an adequate opportunity to rebut CFIUS's concerns. *See* ECF No. 31 at 28–29. According to the defendants, CFIUS's April 30 letter was "argumentative" rather than "neutral." *Id.* at 28. But, even accepting the defendants' characterization of the April 30 letter, nothing in *Ralls* or the due process clause prevents CFIUS from forming, or requires it to hide, its subjective view of the evidence. To the contrary, *Ralls* requires CFIUS to provide notice of its concerns so that the parties may tailor their submission to CFIUS's concerns and rebut the factual premises underlying the official action. *Ralls*, 758 F.3d at 320. To the extent the defendants took issue with CFIUS's characterizations of the evidence, they had the opportunity to rebut them. The defendants also argue that they did not have an adequate opportunity to rebut CFIUS's second, July 7 letter because by that time "the decision to refer the

---

[3]    In addition to excluding classified information, CFIUS excluded certain controlled unclassified information. ECF No. 41-1 ¶¶ 13–16; ECF No. 44 at 34. Controlled unclassified information is information that, while not classified, is protected from disclosure by other laws, regulations, or government-wide policies. ECF No. 41-1 ¶ 7. A Defense Department official attests that CFIUS excluded controlled unclassified information referencing active law enforcement investigations from the letters to the defendants. *Id.* ¶ 15. In addition, CFIUS generalized certain controlled unclassified information relating to the Department of Defense's use of Jupiter Systems products, identities of agency subject matter experts, interactions with the parties, and U.S. government authorities CFIUS considered in determining no other legal authorities are available to mitigate the national security risk posed by the transaction. *Id.* ¶ 14. The defendants do not make entirely clear whether they believe they were entitled to any controlled unclassified information, and if so, what information. In any event, based on the current record, the court finds the exclusion and generalization of this information was not prejudicial, and the defendants have not argued otherwise.

The defendants also speculate that the President may have considered information that was not disclosed to them, noting that the Treasury Department official who testified could not rule it out. *See* ECF No. 43 at 11; ECF No. 44 at 83 (Oldham testifying that "I'm not in the President's office, so I can't say if he looked at other documents or not"). The court finds no basis to credit that speculation. In any event, the D.C. Circuit has said "[a]dequate process at the CFIUS stage . . . would also satisfy the President's due process obligation." *Ralls*, 758 F.3d at 320.

matter to the President had already been made." ECF No. 43 at 10. But CFIUS's April 30 letter—which provided the defendants with the unclassified and uncontrolled information it relied on, invited the defendants to provide any additional information, and was followed by substantial exchange between CFIUS and the defendants—and the July 7 letter—which summarized the parties' additional back-and-forth and described any further, limited unclassified and uncontrolled information that CFIUS relied on—provided the defendants ample opportunity to rebut CFIUS's concerns. ECF No. 44 at 32–33, 81; *see also* ECF Nos. 35-4, 38-10; ECF No. 44 at 53–54 (Oldham testifying the July 7 letter was intended "to provide any supplemental information on the process that had occurred and, again, reiterate to the parties that we were about to refer to the President"). It may well be true that CFIUS had all but made up its mind to refer the matter to the President after the April 30 letter, the exchange that followed it, and the July 7 follow-up letter, but that does not mean the defendants did not have the opportunity to rebut CFIUS's concerns.[4]

---

[4]   The government says Congress forbade the defendants from asserting their due process argument as a defense to enforcement of the President's order and that they can raise the argument only in the D.C. Circuit. *See* ECF No. 35 at 8–9; ECF No. 41 at 9–13. This is a bad argument. To be sure, after the D.C. Circuit's decision in *Ralls*, Congress amended the Defense Production Act to route suits challenging presidential findings and actions to the D.C. Circuit: "A civil action challenging an action or finding under this section may be brought only in the United States Court of Appeals for the District of Columbia Circuit." 50 U.S.C. § 4565(e)(2); *see* § 1715, 132 Stat. at 2191. But that provision, by its plain text, does not apply here. The defendants did not bring any "civil action challenging an action or finding." 50 U.S.C. § 4565(e)(2). They assert a defense in response to the government's civil enforcement action. Here, Congress specified—and all agree—that the President's findings and actions are not subject to judicial review. *Id.* § 4565(e)(1); *see Ralls*, 758 F.3d at 307–12 (rejecting the argument that the Defense Production Act's judicial review bar encompasses constitutional claims). But nothing in the statute indicates Congress's intent to foreclose a party from raising otherwise valid constitutional defenses. *See McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 157, 159 (2025) (explaining that "[w]hen Congress wants to preclude judicial review in enforcement proceedings, it can easily say so" and courts "do not presume that Congress *silently* intended to preclude judicial review in enforcement proceedings").

The government cites *Yakus v. United States*, 321 U.S. 414 (1944), in support of its argument, but that case establishes the same: Congress speaks clearly when it wants to foreclose a particular

The government is therefore likely to succeed in enforcing the President's order to divest.

## B.  The Government Has Shown Irreparable Harm

The court also finds the government will be irreparably harmed absent preliminary relief. This requires the government to show it will suffer injury that is "both certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). The injury must also be "beyond remediation," meaning that the possibility of corrective relief "at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297–98 (citation omitted).

The government has shown injury of that nature. The court finds that Suirui's continued control of Jupiter Systems poses imminent national security risks. CFIUS made a finding that the transaction poses a risk to national security that would not adequately be addressed by mitigation measures short of divestment, and the President made a finding that Suirui might take action that threatens to impair the national security of the United States. ECF No. 38-10 at 2, 14; ECF No. 35-4 at 1; 90 Fed. Reg. at 31125. And before this court, the government has proffered evidence that Jupiter Systems' products—which include video communications hardware and software used by the Department of Defense and all branches of the military, as well as private entities that own or operate critical infrastructure—could potentially be accessed, and the data on those systems

---

defense. *See id.* at 429–31 (concluding that Congress deprived a district court of jurisdiction to consider the validity of regulations as a defense where Congress stated not only that a specially created federal court possessed "exclusive jurisdiction to determine the validity of any regulation or order," but also explicitly stated that "[e]xcept as provided in this section, no court . . . shall have jurisdiction or power to consider the validity of any such regulation, order, or price schedule"); *see also McLaughlin*, 606 U.S. at 163–64 (recognizing that in *Yakus*, it was not enough that Congress routed challenges to a particular court: "The word 'exclusive' in the first sentence did not itself bar any subsequent review in enforcement proceedings. If it had, then the second sentence of the Emergency Price Control Act—barring any other consideration of the validity of the regulations—would have been unnecessary").

exploited, by the introduction of hardware and software vulnerabilities. ECF No. 44 at 15–17; ECF No. 35-2 ¶ 16. The record shows that Suirui has asserted control over Jupiter Systems since acquiring it, and that Suirui and its employees are subject to laws that allow the Chinese government to compel them to support government investigations, share information, and assist Chinese intelligence agencies. ECF No. 44 at 12–15; ECF No. 35-2 ¶¶ 17–18; ECF No. 38-10 at 3–4; ECF No. 35-4 at 7. The court also credits the government's evidence that the transaction continues to pose national security concerns. *See* ECF No. 44 at 32 (Oldham testifying that "the national security risks of Suirui's continued ownership and control of Jupiter Systems" are "[v]ery much still present"); *see also id.* at 80; ECF No. 35-2 ¶¶ 25, 29. The court finds these concerns are heightened by Suirui's failure to make meaningful efforts to comply with the President's order to divest, which, as Suirui employee and Jupiter Systems CEO Jay Xia testified, is in part because it complained to, and will divest only as approved by, the Chinese government. *See* ECF No. 44 at 13–14, 105, 133–34, 136–37, 140, 145–46; *see also* ECF No. 37-3 at 2 (stating that Suirui submits weekly reports to the Chinese government to provide "updates on the equity sale and forced divestiture of Jupiter" and reports the details of meetings with the U.S. government to the Chinese authorities).

The court also finds that mitigation measures short of divestment are not sufficient to address the national security risks. The government has proffered evidence that access control measures cannot mitigate the national security risks because they rely on the defendants' self-policing. ECF No. 44 at 25, 80; ECF No. 35-2 ¶¶ 26–27. The court also credits the testimony that the agencies monitoring the defendants' implementation of security measures have concerns about Jupiter Systems' ability to maintain access control measures because it is a small company with limited resources and experience implementing security measures. ECF No. 44 at 80; ECF No. 35-

2 ¶ 26. And the court finds that the defendants' proposal that the government simply stop buying Jupiter Systems products is superficial, not a practical way to mitigate the national security risks. *See* ECF No. 43 at 19 n.12; ECF No. 38-10 at 13–14. The proposal does not address national security risks posed by the possible compromise of products already in use by the federal government, or by state, local, and private entities that operate critical infrastructure. *See* ECF No. 38-10 at 6–9, 13–14; ECF No. 44 at 15–16; ECF No. 35-2 ¶¶ 15–16. Accordingly, the court finds, based on the hearing testimony and other evidence before it at this stage, that the national security concerns are bona fide and will persist as long as Suirui maintains control of Jupiter Systems.

In reaching this conclusion, the court does not endorse the government's argument that the "President's finding of a national security threat is by itself enough to satisfy the irreparable harm standard." ECF No. 41 at 19; *see also* ECF No. 35 at 3; ECF No. 44 at 150. To be sure, the President's finding is not one this court can review. 50 U.S.C. § 4565(e)(1). But even when the government asserts irreparable harm based on national security, it must show the harm is "both certain and great" and imminent so as to justify injunctive relief during the period sought—that is, pending litigation. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citation omitted); *see Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626, at *3 (D.C. Cir. Sept. 25, 2025) (concluding that the government did not meet its burden to establish irreparable harm where it did not show that "the indirect effects on national security it posited" were "imminent"). Here, the court finds that the preliminary injunction record, which includes the President's finding of a national security threat arising from the transaction, shows that the threat would remain present pending litigation absent preliminary relief.

For similar reasons, the court also rejects the defendants' argument that the government's national security concerns are speculative and unsubstantiated. *See* ECF No. 31 at 15–19. The

20

government has provided ample support, through testimony and written evidence, for the national security harms that could occur absent preliminary relief. *See TikTok Inc. v. Garland*, 604 U.S. 56, 83–84 (2025) (Gorsuch, J., concurring) (concluding that "the record the government has amassed in these cases after years of study supplies compelling reason for concern" even though "assessing exactly what a foreign adversary may do in the future implicates 'delicate' and 'complex' judgments about foreign affairs and requires 'large elements of prophecy'" (citation omitted)). And its evaluation of the potential national security risks set forth in the President's finding and in the testimony of national security officials in court is entitled to substantial deference. *See id.* at 75 (rejecting argument that it was "unlikely" national security concerns would manifest and giving "substantial deference" to "the Government's informed judgment" that China might seek to compel TikTok to turn over user data for intelligence-gathering purposes (cleaned up)); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010) (recognizing deference must be given to the executive branch's "evaluation of the facts" when the "sensitive and weighty interests of national security" are implicated); *see also Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *2 (D.C. Cir. May 16, 2025) (concluding that the government established irreparable harm where the President's "national-security prerogatives, which were explicitly recognized by Congress," were impeded); *Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 WL 1742853, at *3 (D.C. Cir. June 20, 2025) (same).

The court also rejects the defendants' argument that the government's actions since Suirui acquired Jupiter Systems undermine any claim of imminent threat. ECF No. 31 at 19–22; ECF No. 43 at 8–9. The defendants ask the court to infer there is no bona fide or imminent threat because the government initiated an inquiry into the transaction long after Suirui bought Jupiter Systems and sued only after engaging in months of discussions with the defendants and affording them

extensions for divestment. ECF No. 31 at 19–20; ECF No. 43 at 8–9. To the contrary, the court finds that CFIUS pursued an expeditious and orderly divestment. Before the President issued his order, CFIUS engaged in the review and investigation processes required by statute. *See* 50 U.S.C. § 4565(b)(1)–(2). The government provided evidence that during these processes, Suirui frequently missed deadlines and provided incomplete responses to requests for information from CFIUS, making it challenging for CFIUS to complete a full review of the transaction and leading to some delays. *See* ECF No. 44 at 19–20; ECF No. 35-2 ¶ 19; ECF No. 38-10 at 16–26. Following the President's order, the government sought to work with the defendants to effectuate divestment without litigation, which is typically "the fastest route to securing the divestment." ECF No. 44 at 28–29. And while it is true that the government granted Suirui two extensions after the divestment order, the fact that Suirui asked for extensions and then failed to meaningfully comply with deadlines does not indicate lack of concern or urgency on the part of the government. *See* ECF No. 35-2 ¶ 28; ECF No. 44 at 28–32. Indeed, the government filed this lawsuit just six days after Suirui failed to comply with the most recent divestment deadline, and it filed its preliminary injunction motion nine days after that. *See* ECF No. 44 at 29–31; ECF No. 35-2 ¶ 24; ECF Nos. 1, 6.[5]

---

[5]    The defendants devote significant briefing to whether two dual employees of Suirui and Jupiter Systems improperly accessed Jupiter Systems' facility in violation of access control measures set by CFIUS. *See* ECF No. 31 at 15–17; ECF No. 43 at 5–6. The defendants maintain they repeatedly informed CFIUS that the employees had access, without objection from CFIUS. *See* ECF No. 44 at 61–69, 93–100, 122–27; ECF No. 31-2 ¶¶ 25–30; ECF No. 31-3 ¶¶ 10–14; *see, e.g.*, ECF No. 38-13 at 3, 5; ECF No. 38-4 at 2. The government maintains that the employees continued to improperly access Jupiter Systems' facility for several months despite failing to get a waiver to access the facility, although Oldham acknowledged that the government was concerned about such compliance risks given that Jupiter Systems was a small company and that the government should have been clearer to avoid misunderstanding. ECF No. 35-2 ¶ 26; ECF No. 44 at 25–28, 62–63, 80. The court does not rely on the alleged violation of access controls by the two dual employees as a basis for its finding that the government has shown irreparable harm. However, the court credits Oldham's testimony regarding the risk that Jupiter Systems is not positioned to monitor risks posed by Suirui's control of the company.

### C. The Balance Of The Equities And The Public Interest Favor A Preliminary Injunction

The equities and public interest also support the government's request for injunctive relief. These two factors generally "merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (reasoning that the government's "harm and the public interest are one and the same, because the government's interest *is* the public interest").

There is undoubtedly a strong public interest in addressing national security risks—indeed, it is "an urgent objective of the highest order." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 581 (2017) (citation omitted). In assessing the equities and public interest, the court is mindful that this is not only a circumstance in which the President has made a finding that there is a national security risk, but also one in which he did so pursuant to Congress's express authorization. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate."); *see also Nat'l Treasury Emps. Union*, 2025 WL 1441563, at *3 (explaining that "preserving the President's autonomy under a statute that expressly recognizes his national-security expertise is within the public interest"). And the court has found, based on the record at this stage, that the government's interest in protecting national security here is ongoing, will continue during the preliminary injunction period, and is not speculative.

The defendants raise equities on the other side, including the possibility that the appointment of a receiver will disrupt Suirui's and Jupiter Systems' businesses, such as by making it more difficult for Jupiter Systems to compete or for Suirui to sell Jupiter Systems. ECF No. 31 at 31–32; ECF No. 43 at 13–14. But the court finds that, to the extent interim appointment of a

receiver has consequences for Suirui's or Jupiter Systems' business, that is Suirui's own doing. Suirui had extensive opportunities to divest its interests in Jupiter Systems but did not make meaningful efforts to do so. That includes the opportunity Suirui had to negotiate a voluntary divestment before the President issued the divestment order. ECF No. 44 at 11–12. Although CFIUS sought to work with the defendants to negotiate a voluntary divestment—an option many companies consider to be in their best interest to avoid the very risks the defendants complain of today—Suirui rejected CFIUS's proposals and instead proposed less restrictive mitigation measures that CFIUS had already found insufficient. *Id.*; ECF No. 35-4 at 1–5. And since the President's order, Suirui has consistently delayed any meaningful effort to divest its interests in Jupiter Systems. *See* ECF No. 44 at 21–24, 29–32; ECF No. 35-2 ¶¶ 24, 28. Indeed, the record shows that U.S.-based Jupiter Systems employees favored a quick divestment precisely to protect the business's interest, but Suirui did not support those efforts. ECF No. 44 at 103–08, 114–15, 132, 136–37. Having forgone every opportunity to divest its interests in Jupiter Systems in a way that would be less damaging, Suirui cannot now invoke its own or Jupiter Systems' business as an interest. And even crediting the possible business risk to Suirui and Jupiter Systems, the equities and public interest tilt heavily in the government's favor. *See Winter*, 555 U.S. at 25–26, 31 n.5 (concluding that "documented risks to national security . . . clearly outweigh[ed]" scientific, recreational, and ecological interests).[6]

---

[6]   While the court finds Suirui did not make meaningful efforts to comply with the President's order, the court does not attribute any bad faith to the defendants' witnesses. Jupiter Systems employee Matthew Pestana testified candidly and admirably about the efforts of U.S.-based Jupiter Systems employees to try to find a potential buyer while looking out for the company's best interests. *See* ECF No. 44 at 103–08, 114–15. Suirui employee and Jupiter Systems CEO Jay Xia also testified candidly and credibly, including about Suirui approaching and regularly engaging with the Chinese government, which slowed its progress toward divestment. *See id.* at 132–37, 139–40, 145–46.

### D. Scope of Relief

Having concluded that all factors weigh in favor of a preliminary injunction, the court still pauses to consider and craft the interim relief tailored to the showing the government has made, including the particular claim likely to succeed, harm, equities, and public interest. *See Int'l Refugee Assistance Project*, 582 U.S. at 580 (acknowledging that the court "need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case" (citation omitted)). The government asks the court to appoint a receiver to manage Jupiter Systems during the pendency of this case and provides a detailed proposed order to that effect. ECF No. 6 at 16; *see* ECF No. 35-3. The defendants argue that even if the government is entitled to preliminary relief, the court should allow Suirui to maintain control over Jupiter Systems. ECF No. 43 at 16–19. As discussed below, the court finds that tailoring the relief to the particular claim, harms, equities, and public interest in this case necessitates the appointment of a receiver pending litigation of the government's request for an order requiring full divestment. The court also notes at the outset that, despite having opportunities to address specific terms of a receivership, including those proposed by the government, the defendants have largely declined to do so and instead adhered to their frontline position that Suirui should maintain control of Jupiter Systems pending litigation or Suirui's divestment of its interests in Jupiter. *See id.* at 16–19; *see also* ECF No. 34 at 5, 11, 14–15. While that is the defendants' prerogative, they have in doing so forfeited, and therefore left the court without, their position on many of the details proposed by the government.

The defendants do not dispute that the court has discretion to appoint a receiver as interim relief. *See N.Y. Cmty. Bank v. Sherman Ave. Assocs., LLC*, 786 F. Supp. 2d 171, 175 (D.D.C. 2011) (recognizing "the court has 'broad powers and wide discretion' in determining whether a receivership is appropriate" (citation omitted)); Fed. R. Civ. P. 66. They observe, however, that appointment of a receiver "is an 'extraordinary equitable remedy' and should be granted with

25

'caution.'" *N.Y. Cmty. Bank*, 786 F. Supp. 2d at 175 (quoting *Canada Life Assurance Co. v. LaPeter*, 563 F.3d 837, 844 (9th Cir. 2009)); *see* ECF No. 31 at 31–34. The court agrees.

The court finds that the circumstances of this case necessitate the extraordinary remedy of appointing a receiver, and no remedy short of transferring Suirui's control of Jupiter Systems to a receiver will address the national security risks pending litigation. The court is mindful of the context in which this case arises. Congress has authorized the President to order divestment upon finding the foreign purchaser might take action that threatens to impair the national security and other provisions of law do not provide adequate and appropriate authority for the President to protect the national security, and there is no dispute the President made those findings and ordered divestment in this case. *See* 50 U.S.C. § 4565(d)(1), (4); 90 Fed. Reg. at 31125. The court has concluded the government is likely to succeed in enforcing that order. Thus, while the appointment of a receiver is no doubt an extraordinary remedy, here, the government's request is made in a context where the President has ordered divestment, the court has found the government is likely to succeed on its claim for enforcement of the President's order, and Congress expressly authorized the remedy of divestment for such a claim. *See* 50 U.S.C. § 4565(d)(3); 90 Fed. Reg. at 31125. The appointment of a receiver is therefore less drastic than the final injunctive relief the government seeks and is likely to obtain. And it is tailored to the national security risks posed by Suirui's continued control of Jupiter Systems pending litigation, while also allowing Suirui to continue to hold its equity in Jupiter Systems until the case resolves. *See* ECF No. 44 at 176 (the government acknowledging that Suirui would continue to hold equity in the company during the receivership).

The court also finds that no form of relief short of transferring Suirui's control of Jupiter Systems would adequately respond to the government's particular showing of harm, the equities,

and the public interest. *See Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997) ("The most significant factor in the propriety of appointing a receiver is whether any other remedy is likely to be successful."). As set forth above, the court must give deference to the President's finding that Suirui, through its ownership of Jupiter Systems, poses a national security threat, and the court credits the government's evidence that this risk will continue pending litigation and cannot be adequately mitigated as long as Suirui maintains control. The defendants propose various alternative remedies: requiring the parties to provide regular status updates to the court, giving Suirui more time to divest its interests in Jupiter Systems, appointing a mediator to facilitate divestment, or appointing a monitor to undertake an assessment of current risks associated with Suirui's continued control of Jupiter Systems. *See* ECF No. 43 at 18–19; ECF No. 44 at 204–05. But none of these proposed remedies address the core problem—reflected in the President's findings and reiterated in the evidence before the court—that Suirui's control of Jupiter Systems poses a national security risk. The court finds that status updates to the court, whether from the parties or from a third-party monitor, will not mitigate the national security risks described by the government. These include risks that technology used by the government, including all branches of the military, the Department of Defense, and entities that operate critical infrastructure, could be compromised. *See* ECF No. 44 at 15–17; ECF No. 35-2 ¶ 16; ECF No. 38-10 at 2, 14. And the court also finds that providing Suirui with more time to divest is an inappropriate remedy given Suirui's failure to make meaningful efforts to divest despite having many opportunities to do so. *See* ECF No. 44 at 21–24, 29–32; ECF No. 35-2 ¶¶ 24, 28

The government has proposed detailed terms to govern the receivership, which the court adopts in large part after its own review. *See* ECF No. 35-3. The defendants decline to engage with the details of the government's proposal, offering only a few cursory objections. First, the

27

defendants question whether the government's proposed receiver, Bradley Sharp, "has the experience necessary to run a company like Jupiter." ECF No. 43 at 16. But aside from a conclusory assertion of "lack of experience," the defendants do not say what they mean. *Id.* The court also notes that, despite indicating they would want to be a part of the process of selecting a receiver, the defendants did not meaningfully engage in that process or propose any alternative receivers to the government or to the court, despite having the opportunity to do so after the government moved for a preliminary injunction. *See* ECF No. 27 at 6 (the government indicating it was setting up interviews for potential receivers during an early status conference); ECF No. 34 at 5, 11 (the government stating that it had invited the defendants "to engage in a discussion about identifying a receiver" but "to date, defense counsel has not taken the government up on that invitation"); ECF No. 34 at 10–15 (the court directing the parties to confer regarding "the identity of a receiver" and the defendants' engagement in the process of selecting a receiver); ECF No. 44 at 5 (the government indicating that it "shared the resumes of three individuals it had interviewed and was pleased with and open to proposing" with the defendants, but the defendants "informed that their position was, at this time, they were not able to agree to one of those individuals"). In any event, the court finds that Sharp—who has significant experience acting as a fiduciary, providing crisis management services across many industries, and serving as a receiver in prior cases—is qualified to serve as a receiver. *See* ECF No. 35-6.[7]

---

[7] In a footnote, the defendants say they should have the opportunity to interview Sharp or propose alternative receivers. *See* ECF No. 43 at 16 n.10. But the court finds that, to the extent the defendants wish they had more involvement in the process of selecting a receiver, their lack of involvement was due to their own actions. Despite opportunities to do so—including at the encouragement of the court—the defendants have not made any meaningful effort to participate in the process of selecting a receiver, whether it be with the government or to rebut the government's proposal in court. *See* ECF No. 34 at 5, 10–15; ECF No. 44 at 5.

Second, the defendants suggest that certain terms of the proposed receivership afford the receiver too much power to oversee and report on Jupiter Systems' financial health, give the receiver too much protection from liability in carrying out his duties as receiver, and fail to limit the receiver's compensation or ability to spend Jupiter System's resources. ECF No. 43 at 17–18. But the court finds that the proposed order, including these provisions, strikes an appropriate balance of allowing the receiver to carry out his duty to take control of Jupiter Systems pending litigation, preserving Jupiter Systems' ability to make business decisions during that period, and providing appropriate oversight and accountability. For example, contrary to the defendants' assertions, the proposed terms require court approval for the receiver's compensation and non-routine expenses above a certain threshold. ECF No. 35-3 ¶¶ 5, 43. The court also notes that the extent of the authority granted in the proposed receivership order is comparable to that granted by courts in other cases, even in cases that did not implicate national security. *See, e.g.*, Order Appointing a Receiver, *Genesis Capital, LLC v. Lauravin Luxury Apartments Homes, LLC*, No. 23-cv-00795 (D.D.C. July 3, 2023), ECF No. 21; Order Appointing Receiver, *Sec. & Exch. Comm'n v. Legend Venture Partners LLC*, No. 23-cv-05326 (S.D.N.Y. July 7, 2023), ECF No. 33. The court does, however, modify the proposed order in one way raised by the defendants, to remove a provision that would give the receiver authority to wind down business operations of the company. *See* ECF No. 43 at 17; ECF No. 35-3 ¶ 21. The court finds that provision to be inconsistent with the purpose of the preliminary injunction to maintain the status quo.

The defendants also argue that certain terms of the proposed receivership order, such as the requirement that the receiver notify officers, employees, and relevant third parties of the receivership, will be bad for Jupiter Systems' business. *See* ECF No. 43 at 17. But, as the court has already found, to the extent there are any negative consequences to the defendants' business

29

resulting from the position they find themselves in, it is the result of Suirui's own actions, including its failure to make meaningful efforts to comply with the President's divestment order. Indeed, the record supports that U.S.-based Jupiter Systems employees supported transfer of ownership, and one of the Jupiter Systems employees who testified for the defendants at the hearing acknowledged that having a receiver who could advance the company's interests would be a positive development for the company. *See* ECF No. 44 at 104–08, 114–15, 132, 136–37.[8]

### E. Consolidation With The Merits

At the court's preliminary injunction hearing, the court raised the question of whether the government's preliminary injunction motion should be consolidated with the merits and asked the parties to further address the question in post-hearing briefs. ECF No. 44 at 5, 220; Minute Order (Mar. 11, 2026); *see* Fed. R. Civ. P. 65(a)(2). The government responded that it supports consolidation with the merits. ECF No. 41 at 24. However, upon reviewing the parties' arguments, the court agrees with the defendants that even if they do not prevail at the preliminary injunction stage, they should be provided the opportunity to more fully investigate and brief their defenses in this case. *See* ECF No. 43 at 19–23.

### III. Conclusion

For these reasons, the court grants the government's motion for preliminary injunction. A separate order accompanies this memorandum opinion.

---

[8]  In a footnote, the defendants ask the court to stay any preliminary injunction pending appeal. *See* ECF No. 43 at 23 n.13. That request is denied as premature. If, after reviewing this opinion and order, the defendants decide to pursue an appeal, they may move for a stay pending appeal, and the court will consider it in the ordinary course.

AMIR H. ALI
United States District Judge

Date:   May 26, 2026